JOSEPHINE LINKER HART, Associate Justice | ]Appellant, Jimmy Paul Pickle, entei’ed a conditional guilty plea and appealed from the circuit court’s denial of his motion to suppress, arguing that two Arkansas Game and Fish Commission officers violated his right to be free from unreasonable searches and seizures as provided under the Fourth Amendment to the Constitution of the United States and article 2, section 15, of the Arkansas Constitution. The Arkansas Court of Appeals reversed the circuit court’s decision. Pickle v. State, 2014 Ark. App. 726, 453 S.W.3d 157. We granted the State’s petition for review,- and we treat the appeal as if it had been originally filed in this court. Fowler v. State, 2010 Ark. 431, 1, 371 S.W.3d 677, 679. We reverse the circuit court’s decision. In reviewing a circuit court’s denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical fact for |2clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court. See, e.g., Malone v. State, 364 Ark. 256, 262, 217 S.W.3d 810, 814 (2005). Pickle does not dispute the facts presented by the State at the suppression hearing. At the hearing, Sergeant Brian Aston, a law-enforcement officer with the Arkansas Game and Fish Commission, testified that on November 18, 2012, he and another officer, Jeff McMullin, came into contact with Pickle and his duck-hunting party while the officers were working a section of the Cache River. According to Aston, the officers made their way to within fifty yards of Pickle’s duck-hunting party and observed them for approximately two hours. Aston admitted that during the two hours that he observed Pickle’s hunting party, he did not see any hunting violations. He and McMullin decided to make contact with them and check for compliance with state and federal regulations pertaining to the harvest of waterfowl. In order not to be observed, they maneuvered to a point where the Cache River met an oxbow lake. McMullin used binoculars to “maintain a visual” to ensure that the hunting party did not hide or discard any waterfowl or other items while he attempted to approach. Aston recalled that the grass was waist high and that he was able to “belly crawl” to a point where he was in thicker cover. When he got to within sight of Pickle’s hunting party, he identified himself as a game warden and signaled for McMullin to join him. Pickle’s hunting party consisted of three individuals. At the time Aston made contact with them, however, they were preparing to eat breakfast, and their guns were leaning against trees. The parties’ guns were then inspected for compliance with federal hunting regulations, |3and Pickle’s gun was found to be in compliance. During the inspection, which lasted for twenty to twenty-five minutes, Aston looked inside any bags, opening them up to inspect their contents. According to Aston, after writing a citation for one member of the party, he stepped away, telling the hunting party to “have a safe day.” McMullin told Aston that Pickle had said that he had left his license in his truck. “For officer’s safety reasons,” they stepped back to a point where they could not be observed by the hunting party and made a telephone call to Little Rock dispatch. Aston ran a “10-26 Hunting and Fishing License check” and confirmed that Pickle’s license was valid. He also ran a “10-51 check through NCIC” to find out if Pickle had any outstanding warrants. According to Aston, it was his “personal protocol” to run a hunting-license check and a warrant check when a hunter does not have a hunting license on his person. He further stated that he would not have done so if Pickle had a hunting license on his person. He was advised that Pickle was a convicted felon. The officers made their way back to Pickle and arrested Pickle for being a felon in possession of a firearm. When he searched Pickle, he found on Pickle’s person a small quantity of methamphetamine and a glass pipe. He turned Pickle over to the custody of a deputy sheriff from Craighead County. In denying Pickle’s motion to suppress, the circuit court found that Pickle did not have a reasonable expectation of privacy because he was engaged in the “highly regulated activity of hunting waterfowl.” The court also found that Arkansas’s “compelling interest in preserving the wildlife of the State of Arkansas and regulating its exploitation for the benefit of all citizens” weighed in favor of allowing the warrantless searches and seizures by game wardens because “the State’s compelling and special objectives cannot be achieved through' means ^significantly less restrictive of privacy freedoms and that the intrusion upon the defendant was slight.” Relying chiefly on Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), our decision in State v. Allen, 2013 Ark. 35, 425 S.W.3d 753, and Rule 3.1 of the Arkansas Rules of Criminal Procedure, Pickle argues on appeal that he was unlawfully detained and unlawfully searched in violation of his rights under the Fourth Amendment to the United States Constitution and article 2, section 15, of the Arkansas Constitution because the game wardens had neither a warrant nor a reasonable suspicion of any violation of law. In Prouse, the United States Supreme Court held that the practice of police officers making random stops of vehicles to check driver’s licenses and vehicle registrations was unreasonable under the Fourth Amendment. The Court noted that the Fourth Amendment imposes a standard of reasonableness upon the exercise of discretion by government officials to safeguard the privacy and security of individuals against arbitrary invasions. Id. at 653-54, 99 S.Ct. 1391. The Court observed that “the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual’s Fourth Amendment interests against its promotion of legitimate governmental interests.” Id. at 654, 99 S.Ct. 1391. The Court concluded that.in “those situations in which the balance of interests precludes insistence upon some quantum of individualized suspicion, other safeguards are generally relied upon to assure that the individual’s reasonable expectation of privacy is not subject to the discretion of the official in the field.” Id. at 654-55, 99 S.Ct. 1391 (citations omitted)(internal quotation marks omitted). While the Court noted that there are certain “ ‘relatively unique circumstances’ ” in which consent to regulatory restrictions is presumptively concurrent with participation in the regulated enterprise.... [Regulatory |,.¡inspections unaccompanied by any quantum of individualized, articulable suspicion must be undertaken pursuant to previously specified neutral criteria. Id. at 662, 99 S.Ct. 1391 (citations omitted)(internal quotation marks omitted). It was concluded in a short concurring opinion that I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court’s balancing process, and the value factors finder consideration, would be quite different. Prouse, 440 U.S. at 664, 99 S.Ct. 1391 (Blackmun, J., concurring). The record was not sufficiently developed to indicate whether there were previously specified neutral criteria by which the officers’ conduct could be deemed to have been conducted pursuant to a regulatory inspection that did not need to be accompanied by any quantum of individualized, articulable suspicion. This case may rightly be compared to our decision in Allen, where this court affirmed the circuit court’s decision to suppress the evidence found after a game warden stopped, boarded, and searched a boat on Lake Hamilton, even though no violations had been observed before the stop. We observed that “this means that whether the stop is proper depends only on the law-enforcement officer’s subjective assertion of his or her purpose when the Fourth Amendment requires objective facts supporting the stop or a plan embodying explicit, neutral limitations.” Allen, 2013 Ark. 35, at 5, 425 S.W.3d at 757. In the present matter, the record was not developed. Nevertheless, we need not decide whether .the officer’s investigation of Pickle to check for compliance with state and federal regulations pertaining to the harvest of waterfowl was for compliance with state and federal regulations pertaining to the harvest of waterfowl was | ¡¡unreasonable. Pickle cites to Arkansas Rule of Criminal Procedure. 3.1, which provides as follows: A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer’s presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense. Even assuming, but not deciding, that it was appropriate for the officers to conduct a search absent a reasonable, articulable suspicion, the evidence used to charge Pickle of possession of a firearm, possession of a controlled substance, and possession of drug paraphernalia, was adduced by the officers after they had completed any inquiry into Pickle’s compliance with state and federal regulations pertaining to the harvest of waterfowl. In fact, Aston admitted that it was his “personal protocol” to conduct a warrant check. Thus, Aston’s exploration of Pickle’s criminal past and the subsequent search of his person went far beyond the scope of any administrative search conducted for the purpose of investigating Pickle’s compliance with hunting laws. See State v. Baldwin, 124 N.H. 770, 475 A.2d 522 (1984) (holding that even if fish and game officers had requisite power to conduct road check to determine compliance with fish and game laws, questioning driver about whether she had any weapons clearly exceeded scope of any permissible road check to determine compliance with fish and game laws). In this sense, the ease is similar to those in which we have observed that an officer’s continued detention of a motorist’s vehicle after the legitimate purpose for the initial traffic stop has terminated [7requires the officer to possess reasonable suspicion that the person is committing, has committed, or is about to commit a felony or a misdemean- or involving danger to persons or property, ás the officer must develop reasonable suspicion to detain before the legitimate purpose of the traffic stop has ended. Lilley v. State, 362 Ark. 436, 208 S.W.3d 785 (2005). Pickle has argued on appeal that he was unlawfully detained and unlawfully searched in violation of his rights under the Fourth Amendment to the United States Constitution and article 2, section 15, of the Arkansas Constitution because the game wardens had neither a warrant nor a reasonable suspicion of any violation of law. Here, even assuming that the officers properly conducted an investigation into Pickle’s compliance with hunting laws, that investigation had concluded. Nevertheless, the officers began a criminal investigation, seeking information to determine whether Pickle was felon, a matter unrelated to Pickle’s compliance with hunting laws, and on discovering that he was a felon, returned to the area and arrested and searched Pickle. On these facts, we cannot say that, prior to the completion of their investigation into Pickle’s compliance with hunting laws, the officers developed reasonable suspicion that Pickle had committed a crime. Thus, we agree with Pickle’s argument and hold that, on our de novo review based on the totality of the circumstances, the facts presented in this case did not give rise to reasonable suspicion allowing officers to conduct a criminal investigation. Reversed and remanded; court of appeals opinion vacated. Hannah, C.J. concurs. Goodson, J., and Special Justice Terry W. Pool concur in part and dissent in part. Danielson, J., dissents. Wynne, J., not participating.